David S. Bloch (SBN: 184530)
blochd@gtlaw.com
GREENBERG TRAURIG, LLP
Four Embarcadero Center, Suite 3000
San Francisco, CA 94111
Telephone: (415) 655-1300
Facsimile: (415) 707-2010

David A. Cheit (SBN CA 121379)
cheitd@gtlaw.com
Yoon-Woo Nam (SBN 284644)
namy@gtlaw.com
GREENBERG TRAURIG, LLP
1201 K Street, Suite 1100
Sacramento, CA 95814-3938
Telephone: (916) 442-1111
Facsimile: (916) 448-1709

Robert A. Hill (AZ SBN: 033415)
(*Admitted Pro Hac Vice*)
hillro@gtlaw.com
GREENBERG TRAURIG, LLP
2375 East Camelback Road, Suite 700
Phoenix, AZ 85016
Telephone: (602) 445-8412
Facsimile: (602) 445-8100

Attorneys for Plaintiff
RINGCENTRAL, INC.

Clement S. Roberts (SBN 209203)
croberts@orrick.com
Annette L. Hurst (SBN 148738)
ahurst@orrick.com
Sarah K. Mullins (SBN 324558)
sarahmullins@orrick.com
Lawrence Burns (SBN 325811)
lburns@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: (415) 773-5700
Fax: (415) 773-5759

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| RINGCENTRAL, INC., a Delaware corporation,<br><br>                Plaintiff,<br><br>        v.<br><br>Nextiva, Inc., an Arizona corporation,<br><br>                Defendants.<br><br>―――――――――――――<br>AND RELATED COUNTERCLAIM. | Case No. 5:19-cv-02626-NMC<br><br>**RINGCENTRAL'S OPPOSITION TO NEXTIVA'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        May 5, 2021<br>Time:        1:00 p.m.<br>Courtroom: 5 (via Zoom)<br><br>Filed:        May 14, 2019<br>Trial Date: July 12, 2021 |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

# TABLE OF CONTENTS
(continued)

**PAGE**

INTRODUCTION .................................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 2

      A.     Nextiva's Scheme Was Supervised By Its Chief Marketing Officer
           And Required A Coordinated Effort Across The Company. ....................... 2

      B.     Summary Of Fake Positive Reviews of Nextiva. ....................................... 7

      C.     Summary Of Fake Negative Reviews of RingCentral. ............................... 8

      D.     Nextiva's Typosquatting and Impersonation of RingCentral
           Employees. ................................................................................................ 9

      E.     RingCentral Suffered Substantial Harm From Nextiva's Unlawful
           Actions. ................................................................................................... 10

ARGUMENT ....................................................................................................... 13

    I.     NEXTIVA IS NOT ENTITLED TO SUMMARY JUDGMENT ON
         RINGCENTRAL'S DEFAMATION AND TRADE LIBEL CLAIMS. .............. 13

      A.     Nextiva's Juicing Of Its Product Ratings Supports Claims For
           Defamation And Trade Libel ................................................................... 13

      B.     A Reasonable Jury Could Conclude That RingCentral Can
           Establish The Requisite Losses. ............................................................... 14

    II.     SUMMARY JUDGMENT IS NOT WARRANTED ON
         RINGCENTRAL'S INTENTIONAL INTERFERENCE CLAIM. ..................... 17

      A.     A Reasonable Jury Could Conclude That RingCentral Has
           Established Lost Sales Associated With Specific, Named
           Customers. ............................................................................................... 17

      B.     A Reasonable Jury Could Conclude That Nextiva Knew It Was
           Interfering With RingCentral's Prospective Contractual
           Relationships. .......................................................................................... 18

    III.     INJUNCTIVE RELIEF IS WARRANTED ON RINGCENTRAL'S UCL
         CLAIM. ............................................................................................................ 19

    IV.     RINGCENTRAL HAS STANDING TO PURSUE ITS
         CYBERSQUATTING CLAIM AND NEXTIVA IS LIABLE FOR
         LABUNSKI'S ROLE IN IT. ............................................................................ 21

      A.     RingCentral Has Suffered Actionable Harm Due To Nextiva's
           Cybersquatting. ....................................................................................... 21

      B.     Labunski's Actions Are Attributable To Nextiva. .................................... 22

           1.     Labunski had actual authority as Nextiva's agent to register
                and use ringcetrnal.com. ................................................................ 22

**TABLE OF CONTENTS**
(continued)

**PAGE**

        2.     Nextiva negligently supervised Labunski. .................................... 24

CONCLUSION ..................................................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  722 F.3d 1229 (10th Cir. 2013) .......................................................................... 23, 24

*Altera Corp. v. Clear Logic, Inc.*,
  424 F.3d 1079 (9th Cir. 2005) .................................................................................. 18

*Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
  456 U.S. 556 (1982) .................................................................................................. 23

*Amy v. Curtis*,
  2020 WL 5365979 (N.D. Cal. Sept. 8, 2020) .......................................................... 22

*Anheuser-Busch, Inc. v. Bavarian Brewing Co.*,
  264 F.2d 88 (6th Cir. 1959) ...................................................................................... 21

*Appel v. Burman*,
  159 Cal.App.3d 1209 (1984) ..................................................................................... 17

*California Serv. Station etc. Assn. v. Union Oil Co.*,
  232 Cal.App.3d 44 (1991) ......................................................................................... 20

*Callahan v. A.E.V., Inc.*,
  182 F.3d 237 (3d Cir. 1999) ...................................................................................... 11

*Campbell v. Facebook, Inc.*,
  951 F.3d 1106 (9th Cir. 2020) .................................................................................. 21

*Charles Atlas, Ltd. v. Time-Life Books, Inc.*,
  570 F.Supp.150 (S.D.N.Y. 1983) .............................................................................. 17

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) .................................................................................... 23

*Complete Ent. Res. LLC v. Live Nation Entm't, Inc.*,
  2017 WL 6512223 (C.D. Cal. Oct. 16, 2017) .......................................................... 11

*Ellsworth v. Martindale-Hubbell Law Dir.*,
  68 N.D. 425 (1938) ................................................................................................... 16

*Films of Distinction, Inc. v. Allegro Film Prods., Inc.*,
  12 F.Supp.2d 1068 (C.D. Cal. 1998) ....................................................................... 15

*Forsher v. Bugliosi*,
  26 Cal.3d 792 (1980) .......................................................................................... 13, 14

*Harrods Ltd. v. Sixty Internet Domain Names,*
   302 F.3d 214 (4th Cir. 2002) ............................................................................. 21

*HipSaver, Inc. v. Kiel,*
   464 Mass. 517 (2013) ....................................................................................... 17

*Lahoti v. Vericheck, Inc.,*
   636 F.3d 501 (9th Cir. 2011) ........................................................................... 11

*Laser Indus., Ltd. v. Reliant Techs., Inc.,*
   167 F.R.D. 417 (N.D. Cal. 1996) ...................................................................... 9

*Leonardini v. Shell Oil Co.,*
   216 Cal.App.3d 547 (1989) ....................................................................... 15, 17

*Lombardo v. Huysentruyt,*
   91 Cal.App.4th 656 (2001) ........................................................................ 15, 18

*Mann v. Quality Old Time Serv., Inc.,*
   120 Cal.App.4th 90 (2004), *disapproved of on other grounds by Baral v.*
   *Schnitt,* 1 Cal. 5th 376 (2016) ......................................................................... 16

*Meyer v. Holley,*
   537 U.S. 280 (2003) ......................................................................................... 23

*Mitchell v. Gonzales,*
   54 Cal.3d 1041 (1991) ...................................................................................... 15

*Monex Deposit Co. v. Gilliam,*
   680 F.Supp.2d 1148 (C.D. Cal. 2010) ........................................................ 18, 19

*Operation Tech., Inc. v. Cyme Int'l T&D, Inc.,*
   2016 WL 6246806 (C.D. Cal. 2016) ................................................................ 23

*Pac. Supply Co-op. v. Farmers Union Cent. Exch. Inc.,*
   318 F.2d 894 (9th Cir. 1963) ........................................................................... 21

*Pacheco v. United States,*
   220 F.3d 1126 (9th Cir. 2000) ......................................................................... 16

*Ramona Manor Convalescent Hosp. v. Care Enters.,*
   177 Cal.App.3d 1120 (1986) ............................................................................ 18

*Rite Aid Corp. v. Lake Shore Invs.,*
   298 Md. 611 (1984) .......................................................................................... 17

*Seneris v. Haas,*
   45 Cal.2d 811 (1955) ........................................................................................ 22

- iv -

*Shenwick v. Twitter, Inc.*,
   2021 WL 1232451 (N.D. Cal. Mar. 31, 2021) ........................................................ 19

*Spokeo, Inc. v. Robins*,
   136 S.Ct. 1540 (2016) ............................................................................................ 22

*Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC*,
   205 Cal.App.4th 999 (2012) .................................................................................... 17

*Transcription Commc'ns Corp. v. John Muir Health*,
   2009 WL 666943 (N.D. Cal. Mar. 13, 2009) .......................................................... 19

*United States v. Ballou*,
   59 F.Supp.3d 1038 (D.N.M. 2014) ........................................................................... 9

*United States v. Nava*,
   687 F.App'x 528 (9th Cir. 2017) ............................................................................. 24

*Vachani v. Yakovlev*,
   2016 WL 7406434 (N.D. Cal. Dec. 22, 2016) ........................................................ 14

*Weller v. Am. Broad. Cos., Inc.*,
   232 Cal.App.3d 991 (1991) ..................................................................................... 14

*Wright v. Coules*,
   4 Cal.App. 343 (1906) ............................................................................................. 16

*Yanez v. Plummer*,
   221 Cal.App.4th 180 (2013) .................................................................................... 15

**Statutes**

15 U.S.C. § 1125(d)(1)(A) ........................................................................... 21, 22, 25

Cal. Civ. Code § 48a ............................................................................................... 14

California Bus. & Professions Code § 17200 ............................................................ 1

Fed. R. Civ. P. 56(d) ............................................................................................... 24

Fed. R. Civ. P. 104(b) ............................................................................................... 9

Fed. R. Evid. 803(3) ................................................................................................ 11

Fed. R. Evid. 803(6) ................................................................................................ 11

**Other Authorities**

47 C.F.R. § 64.1201(c)(2) .................................................................................... 6, 20

Judicial Council of California Civil Jury Instructions (2020) .......................... 14, 15, 18

1

2

Restatement (Second) of Torts (1977) ...................................................................................... 16, 17

3

Restatement (Third) Of Agency (2006). ........................................................................ 23, 24, 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**INTRODUCTION**

2      Nextiva's motion for summary judgment admits that Nextiva is responsible for *some* fake

3 negative reviews of RingCentral, and does not challenge the defamatory nature of those reviews.

4 It just undercounts them (by a lot).  Similarly, while Nextiva challenges RingCentral's unfair

5 competition claim under California Business & Professions Code § 17200, it leaves untouched

6 RingCentral's common law unfair competition claim.  So, RingCentral's case will go to trial.

7 Nextiva's motion is little more than an over-long motion in limine directed to its massive

8 campaign of fake positive reviews, and a Hail Mary trying to avoid its responsibility for some of

9 the actions of its longtime marketing hatchet man, Baruch Labunski.

10      Nextiva says the Court should eliminate its fake positive reviews from the jury's

11 consideration.  But those reviews played a central role in accomplishing the object of the

12 defamatory scheme—to defame RingCentral by telling them that RingCentral *was poorly*

13 *regarded, particularly in comparison to Nextiva*.  This was false.  RingCentral was not poorly

14 regarded in comparison to Nextiva; rather, Nextiva had dramatically juiced its ratings (by more

15 than a full point on a five-point scale) and then spiked RingCentral with a number of well-chosen

16 bad reviews.  Nextiva's salespeople then pumped out those comparisons to prospective

17 customers, and it worked.  Customers exposed to the lies stopped buying from RingCentral,

18 viewing Nextiva as a reasonable alternative.

19      It took the full sweep of Nextiva's scheme—a scheme Nextiva largely admits took

20 place—to accomplish its defamation and trade libel.  Without the fake positive reviews,

21 RingCentral would have remained far more highly rated than Nextiva and the fake bad reviews

22 would have had far less purchase.  Nextiva posits that RingCentral was not *really* harmed by the

23 fake review scheme, despite the text of the fake negative reviews and Nextiva's inflated rankings.

24 Nextiva claims that Labunski was not really doing its bidding and RingCentral was not *really*

25 harmed by his impersonation of RingCentral's CEO and his daughter.  These are quintessential

26 questions for the trier of fact.  Likewise, the Court should only consider Nextiva's belated

27 promise that it has changed its ways by scrutinizing its witnesses at trial.

28      RingCentral is entitled to the full scope of its claims at trial.

RINGCENTRAL'S OPP TO NEXTIVA'S MOTION
FOR SUMMARY JUDGMENT
5:19-cv-02626-NMC

**STATEMENT OF FACTS**

RingCentral and Nextiva compete head-to-head in the Unified Communications as a Service industry, where they both target the very large market of small and medium-sized businesses.  Online reviews play a key role in the purchasing decisions of these consumers.  As Nextiva admits:

> The customers for whom Nextiva and RingCentral compete make their buying decisions primarily on research they conduct online, e.g., via review websites…. Both purchasers and channel partners [helping customers select a service provider] rely on and trust as authentic and accurate the information and reviews they find and read online.  Accordingly, for companies offering a unified cloud-based communication service, such as Nextiva and RingCentral, reputations are vital assets that drive and maintain their competitive positions in the industry.

ECF 67 ¶ 12.

Recognizing the importance of reviews to its business, and seeking to improve its revenue and market share, Nextiva undertook a multi-year campaign to post fake positive reviews of its own services and illegitimate negative reviews of RingCentral.  A summary of the major players and the actions they undertook to further the scheme follows.

**A.  Nextiva's Scheme Was Supervised By Its Chief Marketing Officer And Required A Coordinated Effort Across The Company.**

A college dropout, Masjedi is **Nextiva CEO Tomas Gorny**'s brother-in-law.  Masjedi first hired **Baruch Labunski of "Rank Secure"** in or around 2013 to work on search engine optimization.  Mullins Dec. Ex. 1 (2-18-21 Masjedi Depo.) at 324:17-325:2.  Labunski's work for Nextiva involved extreme tactics to improve Nextiva's reputation and relative position in the market.  Although the full scope of Labunski's activities is still unclear—Labunksi's lawyer just announced that Labunksi has contracted COVID-19 and postponed his deposition and production of documents (*see* Hurst Dec. ¶¶ 3-7)—the broad outlines are clear enough.

At least as early as August 2017, Masjedi and Labunski openly discussed posting fake positive reviews of Nextiva and fake negative reviews of competitors.  *See id.* Ex. 2 (Labunski admitting to posting a positive review of Nextiva on downdetector.com).  By mid-2017, Masjedi had already explicitly demanded that Labunski post fake negative reviews of another Nextiva

1   competitor, 8x8, by impersonating an 8x8 employee and asking for access to their Verified

2   Reviews account.  *See id.* Ex. 3. ████████████████████████████████

3   ████████████████████████████████████████████████

4   ████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████████████████████████████████████

12  ████████████████████████████████████  ████████ This

13  effort continued throughout 2018, with Labunski uploading thousands of reviews on Verified

14  Reviews.  *Id.* Exs. 8, 9, 10.  By the end of November 2018, Labunski's efforts had succeeded in

15  "remov[ing] most of [Nextiva's] bad Google Reviews."  *Id.* Ex. 11.

16        In the fall of 2018, Masjedi and Labunski also sought to have Nextiva be featured by

17  Gartner as a "FrontRunner" for Call Center Software on Gartner's Software Advice website.  *See*

18  *id.* Ex. 12.  Gartner's ranking methodology evaluated user reviews for Nextiva's product across

19  three Gartner sites: Software Advice, Capterra, and GetApp.  *Id.*  ("[T]he more new reviews the

20  better!").  But the reviews had to look and feel as though they were created by real companies.

21  *See id.* Ex. 13 ("Natural and real is the key.").

22        So, in September 2018, Labunski used Masjedi's credit card to register 25 domains of

23  fake businesses with the domain registrar Namecheap.   Hill Dec. Ex. 1 [RC_Sub_003527]

24  (listing domains associated with Order ID 3840889), *id.* [RC_Sub_003540] (showing that Order

25  ID 3840889 was paid for with a credit card bearing the name "Yaniv Masjedi" with the last four

26  digits 4046), *id.* (showing several purchases for a credit card in Baruch Labunski's name on the

27  ―――――――――
[1] Google uses various review sites to inform its seller ratings, including Verified Reviews. *See*
28  *About seller ratings ads extensions*, GOOGLE, available at https://support.google.com/google-ads/answer/2375474?hl=en.

1    same Namecheap account). ███████████████████████████████████

2    ███████████████████████████████████████████ Masjedi

3    enlisted the aid of other Nextiva employees to help create phone lines with greetings for the 25

4    fake businesses.  *Id.* Exs. 15-16.

5            As part of the effort to improve Nextiva's Gartner rankings, Labunski also came up with a

6    plan to "beat the system" on Gartner's Capterra site by buying aged LinkedIn accounts and

7    associating them with fake reviewers.  *Id.* Ex. 17.  Labunski asked Masjedi to pay him for the

8    shady transactions using a "fake PayPal account."  *Id.*  Masjedi told him to "Do it."  *Id.* ██████

9    ███████████████████████████████████████████████

10   █████████████████████████████████████████████████

11   ██████████████████████████████

12           Masjedi was not only aware of Labunski's activities but also took an active role in

13   supervising the scheme.  Masjedi (**1**) reviewed the fakes before they were posted, *id.* Exs. 19

14   (May 2018 email from Masjedi to Labunski stating, "I want to see the reviews before you

15   submit."), 20 (September 2018 email from Labunski to Masjedi mentioning "stars" and giving

16   Masjedi the login information to cloud storage account), 21 (same); (**2**) told Labunski the average

17   rating he should aim for with the fake reviews, *id.* Exs. 7, 19; (**3**) told Labunski where he should

18   post reviews, *id.* Ex. 20; (**4**) extorted Labunski to post more reviews, *id.* Ex. 22; and (**5**) had the

19   password to login to at least one of Labunski's Namecheap accounts, *id.* Ex. 55.

20           In their communications, Masjedi and Labunski were uniquely focused on harming

21   RingCentral:

22       •   April 2018:  Labunski emails Masjedi about his plan to post thousands of reviews online

23           to "kill RC END OF STORY!!"  *Id.* Ex. 7.

24       •   ██████████████████████████████████████████████

25           ███████████████████████████████

26       •   November 2018:  Masjedi tells Labunski that, "We need [RingCentral] to be done," and

27           states "Jive and RC are in my nightmares."  *Id.* Ex. 24.  Later, he said, "People are doing

28           a lot of research these days.  They are seeing Jive and RingCentral looking prime on

- 4 -

1    many review sites." *Id.* Ex. 10.

2    ███████████████████████████████████████████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ████    Although Masjedi and Labunski seemed to have ceased using email to coordinate their

6    scheme after complaints in early 2019, Labunski was still involved as late as August 2020 when

7    he discussed with Masjedi Nextiva's need to pay Verified Reviews to maintain its Google

8    ranking.  *Id.* Ex. 26.   This was an elaborate campaign to cause harm to RingCentral by driving

9    business away from it.  The scheme worked.  Customers began noticing the negative reviews of

10   RingCentral and they considered Nextiva a credible alternative.

11            ***Eric Sornoso, Nextiva's Growth Marketing Manager and a Nextiva contractor***.  Eric

12   Sornoso, a Nextiva employee and *simultaneously* an outside contractor under the name "Fish Free

13   Media," was also involved in posting fake reviews. In December 2017, Sornoso told Masjedi that

14   he had posted a review of Nextiva using an email address associated with one of his domains,

15   gramnow.com.  *Id.* Ex. 27.  Then, in January and February of 2018, Sornoso posted at least three

16   fake reviews of Nextiva on VoIPReview and Software Advice.  *Id.* Exs. 28 (Sornoso Depo.) at

17   293:7-294:11, 297:8-298:25.  Sornoso promised, in December 2018, to "push" down negative

18   reviews of Nextiva on Capterra.  Ex. 18.  During that same time period, Masjedi made a series of

19   payments to Sornoso via Paypal totaling over $25,000.  *Id.* Ex. 28 (Sornoso Depo.) at 176:23-

20   177:20.  Sornoso had no explanation for the payments.  *Id.*  Sornoso's purported company, Fish

21   Free Media, later entered into a consulting agreement with Nextiva under which he was paid

22   $250,000 per year in addition to his annual salary of $206,000.  *Id.* at 125:1-6, 248:24-249:5.

23            ***Tomas Gorny, Nextiva's CEO***.  Gorny knew about the fake reviews originating from

24   Nextiva's marketing department or, at best, was willfully blind to them.  ████████████████

25   ████████████████████████████████████████████

26   ████████████████████████████████████████████████

27   Labunski also repeatedly sent Gorny emails touting his success with Nextiva reviews.  *Id.* Exs. 32

28   (March 2018 email from Masjedi to Gorny stating that he was "making sure all of our reviews are

1    looking sharp"), 33 (May 2018 email from Labunski to Gorny stating, "I have a plan for Adwords

2    coming that will crush RC by 90%...."), 34 (June 2018 email from Labunski to Gorny stating, "I

3    was just thinking how you don't see value of my work …. 2 months of work just for these

4    reviews.  You and RC are the only in the industry now with this amount").  Gorny and Masjedi

5    have a close, personal relationship.  ███████████████████████████████████████

6    ████████████████████████████████████████████████████████████████████

7    ██████████████████████████████████████████████████

8         ***John Murphy, Nextiva's General Counsel*** received multiple warnings that something

9    was amiss with Nextiva's efforts to maintain its reputation online, yet willfully chose to ignore

10   them.  Murphy helped negotiate Nextiva's 2018 consulting agreement with Labunski.  ████████

11   ████████████████████████████████████████████████████████████████████████

12   ███████████████████████████████████████████████████████████

13   ███████████████████████████████████████████████████████████

14   ██████████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████████████

17   ███████████████████████████████████████  *Even Masjedi understood that sharing*

18   *customer information with Labunski to generate real reviews would violate the law.*  Mullins Dec.

19   Ex. 7.  Murphy has nowhere explained how he could have reviewed this job description and not

20   experienced at least a *frisson* of concern.

21       ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ███████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████

26   ██████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████

28   ██████████████████████

1    In January 2019, Masjedi forwarded Murphy an email from Roger Abbott, the proprietor

2    of the review website VoIPReview.org.  *Id.* Ex. 35.  The email asserted that Abbott had identified

3    "a fraudulent review scheme that in our opinion appears to be conducted by Nextiva or your

4    agents in order to publish fake reviews of your business VoIP services on VoipReview.org and

5    other review sites, while also publishing fake bad reviews about your competitors."  *Id.*  This

6    wasn't just a red flag, it was a bat in the face.  Apparently, Murphy again ignored it.

7    ***Nextiva's Finance Team*** ███████████████████████████████████████

8    ████████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████

11   ██████████████████████████████████████████████████

12   █████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████████

17   █████████████████████████████████████

18                              *    *    *

19   After concealing all of this throughout the discovery period, Nextiva was belatedly forced

20   to admit some of the details of the scheme, including that **(1)** Sornoso registered

21   digitalbrandentertainment.com, a domain used to post a fake negative review of RingCentral,

22   ECF 133 ¶ 26(a); **(2)** Labunski registered 17 different domain names and used several of them to

23   post positive reviews of Nextiva and negative reviews of RingCentral on various review sites, *id.*

24   ¶ 26(c)-(t); **(3)** ████████████████████████████████████████████████

25   ████████████████████████████████████████████ ; and **(4)** Masjedi knew that Labunski

26   was posting online fake reviews, *id.* Ex. 40 (1-29-2021 DiNardi Depo.) at 58:15-18.

27   **B.**    **Summary Of Fake Positive Reviews of Nextiva.**

28   Labunski appears to have posted thousands of fake positive reviews of Nextiva.  In emails

- 7 -

1    produced by Nextiva, Labunski and Masjedi discuss posting over 10,000 fake positive reviews of

2    Nextiva on downdetector.com and verified-reviews.com.  *Id.* Exs. 2, 19 (discussing 4,460 fake

3    reviews), 9 (discussing 1,000 fake reviews), 8 (discussing at least 2,400 fake reviews); 10

4    (discussing posting 987 and then 1,320 fake reviews).  Third-party evidence also demonstrates

5    that Labunski was using the domains that he registered for fake businesses to post reviews on a

6    wide variety of sites.  *Compare* Hill Dec. Ex. 2 at RC_Sub_0004174 (registering kayible.com

7    *with id.* Ex. 5 (showing review posted by that domain on G2).  Email addresses associated with

8    Sornoso or with domains registered by Labunski via his various Namecheap accounts, posted at

9    least 165 additional fake positive reviews of Nextiva on Capterra, Fit Small Business, G2,

10   Gartner, GetVoIP, Software Advice, and VoIPReview.  Yearwood Dec. ¶ 18.

11          **C.     Summary Of Fake Negative Reviews of RingCentral.**

12          Additionally, the evidence is sufficient to establish that Nextiva posted many fake

13   negative reviews of RingCentral's products and services.  RingCentral's expert, former FBI agent

14   Ron Yearwood identified a fake negative review as "verified" only if it could be established as

15   fake by tying it directly to the then-known domains registered by Baruch Labunski on

16   Namecheap or the websites owned by Eric Sornoso.  Yearwood Dec. ¶ 6.  Yearwood identified a

17   small number of "verified" reviews (*see* Yearwood Dec. ¶ 7; Mullins Dec. Ex. 28 (Sornoso

18   Depo.) at 297:8–298:5), and Nextiva focuses exclusively on these "verified" reviews in its

19   motion. Mot. at 3-4.

20          But the admissible evidence of fake negative reviews is far broader. Nextiva published at

21   least 85 negative fake reviews of RingCentral's services—and likely many more.  Yearwood Dec.

22   ¶ 17.  Although he did not label them "verified" the 85 reviews in Yearwood's declaration (also,

23   of course, disclosed in his reports) contain significant indicia of association with the scheme,

24   including, *inter alia*, negative language shared with verified fake negative reviews, negative

25   RingCentral reviews from IP addresses identical to those of fake positive reviews Nextiva admits

26   it published, posting dates and times that track known and Nextiva-admitted fake positive

27   reviews, mass postings of negative RingCentral reviews from the same shared IP addresses, and

28   distinct username patterns contained in other verified fake reviews.  *Id.* ¶¶ 13-15.  Those

RINGCENTRAL'S OPP TO NEXTIVA'S MOTION
FOR SUMMARY JUDGMENT
5:19-cv-02626-NMC

additional reviews make a variety of negative factual statements about RingCentral, such as:



These 85 reviews bear clear indicia of falsity and unambiguous ties to verified (and Nextiva-admitted) fake reviews; a jury could easily find that they came from Nextiva.  All of the reviews that Yearwood flagged as connected to Nextiva from a forensic perspective fit cleanly into the story told (in part) by Labunksi, Masjedi and Sornoso's communications.[2]

### D.      Nextiva's Typosquatting and Impersonation of RingCentral Employees.

The effects of the fake negative reviews of RingCentral were potentially magnified by Labunski's effort to remove positive reviews of RingCentral through impersonation of RingCentral's employees.  As previously noted, in mid-2017 Masjedi instructed Labunski to impersonate another competitor in order to post fake bad reviews.  Mullins Dec. Ex. 3.  Labunski re-used the idea in late 2018 when he purchased the domain name ringcetrnal.com using fake identities and funds supplied by Nextiva with Masjedi's explicit approval.  *Compare* Mullins Dec. Ex. 41 *with id.* Ex. 42 (requesting and approving payment); Hill Dec. Ex. 2 at 14, 17 (depositing funds and registering domain); ECF 133 ¶ 29 (Nextiva admits Labunski registered the domain name).

Labunski then created fake email accounts on the ringcetrnal.com domain at least for Vlad

---

[2] Because a reasonable jury could conclude that these other 85 negative reviews were part of the scheme, the reviews meet the preliminary threshold for admissibility under Rule 104(b).  *See Laser Indus., Ltd. v. Reliant Techs., Inc.*, 167 F.R.D. 417, 437 (N.D. Cal. 1996) (holding, for evidence that depends on a fact, that court "must rule in favor of admission if a rational jury could draw the necessary fact inference); *see also United States v. Ballou*, 59 F.Supp.3d 1038, 1067 (D.N.M. 2014) ("Rule 104 is not a high standard.").

1  Shmunis, RingCentral's CEO, and Carolyn Shmunis, a marketing manager at RingCentral and

2  Mr. Shmunis' daughter, and tried to use those false identities to eliminate positive reviews of

3  RingCentral at the Better Business Bureau and Fit Small Business.  Hill Dec. Exs. 3-4.  Since

4  Labunski has not yet produced documents and been deposed, RingCentral has not yet obtained

5  the evidence regarding the full scope of his efforts to remove legitimate positive reviews and

6  otherwise harm RingCentral's reputation by impersonating its employees.  See Hurst Dec. ¶¶ 3-

7  13.

8          **E.      RingCentral Suffered Substantial Harm From Nextiva's Unlawful Actions.**

9          Ratings are inherently a comparative marketing tool, so by definition the positive ratings

10  are just as important as the negative ratings for customers making a purchase decision.  Nextiva's

11  campaign to create a favorable head-to-head comparison with RingCentral by inflating its own

12  reputation and denigrating RingCentral's reputation worked exactly as it was intended.

13  RingCentral's customers were diverted to Nextiva.  The millions Nextiva paid Yaniv Masjedi,

14  Eric Sornoso, and Baruch Labunski was well spent, since it significantly distorted the overall

15  impression of customers in the market.

16          Richard Eichmann, one of RingCentral's expert witnesses, calculated that Nextiva's

17  weighted aggregate rating across Fit Small Business, Gartner, GetVOIP, and VoIPReview—sites

18  on which Labunski and Sornoso posted fake reviews—increased from 3.30 out of 5 in 2017 to

19  4.52 out of 5 in 2018.  Mullins Dec. Ex. 43 (Eichmann Depo.) at 68:11-72:2 (discussing his

20  analysis of the average aggregate ratings of Nextiva's and RingCentral's ratings across four

21  review sites from 2017-2020), Ex. 44 at 30, Schedule 7.  This is consistent with Labunski and

22  Masjedi's discussions about posting thousands of fake positive reviews of Nextiva in that time

23  frame.  The increase from 2017 to 2018 resulted in Nextiva's weighted aggregate rating

24  surpassing RingCentral's.  Mullins Dec. Ex. 44 at Schedule 7.  Additionally, a study conducted

25  by RingCentral expert statistician Dr. Samantha Iyengar concluded that the fake reviews were

26  associated with an increase in consumer preference for and willingness to try Nextiva and a

27  decline in the same metrics for RingCentral.  Mullins Dec. Ex. 45 (Iyengar Depo.) at 66:11-67:23

28  (discussing findings contained in her report), Ex. 46 at 3 (findings).

1   Nextiva's review scheme had a real effect on RingCentral's revenues—RingCentral has

2   identified at least $2,681,908 in annual revenue lost to "negative customer perception" in the

3   marketplace.  Chou Dec. Ex. A.[3]  Many of these customers cited review sites where Labunski

4   posted negative reviews of RingCentral like VoipReview.org and Fit Small Business as the

5   source of their negative perceptions.  *Id.*

6   Customers were directed by Nextiva to reviews containing large numbers of fake reviews.

7   ███████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  █████████████████████████████████████████████████████

12  ██████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████

14  █████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████

19  ██████████████████████████████████████.  It even re-posted Labunksi's fake positive

20  reviews on its own website.  *Id.* Ex. 57.

21  Nextiva and RingCentral records reflect that customers were reading reviews of both

22  companies published by Nextiva and deciding against RingCentral based on those reviews.  ████

23

---

24  [3] The native version of this spreadsheet has been lodged with the Court as Exhibit 19 to the
    Declaration of Oliver Gold filed in support of Nextiva's Motion.  The spreadsheet is admissible as

25  a business record under Fed. R. Evid. 803(6).  *See* Chou Dec. ¶¶ 3-6.  Statements from customers
    regarding their motives for choosing or rejecting a particular supplier contained in the spreadsheet

26  are admissible under Fed. R. Evid. 803(3)'s "state of mind" exception to the hearsay rule.  *See*
    *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 253 (3d Cir. 1999) (holding that "customers' statements of

27  their motive[s]" for choosing a particular supplier were admissible under Rule 803(3)); *Complete*
    *Ent. Res. LLC v. Live Nation Entm't, Inc.*, 2017 WL 6512223, at *4 n.9 (C.D. Cal. Oct. 16, 2017)

28  (same); *cf. Lahoti v. Vericheck, Inc.*, 636 F.3d 501, 509 (9th Cir. 2011) (customer statements
    demonstrating confusion are admissible under "state of mind" exception to the hearsay rule).

1  ████████████████████████████████████████████████████████████

2  ███████████████████████████████████████████████  Other times,

3  decisionmakers at potential customers found negative reviews on websites known to host them,

4  for instance, a CEO of a potential customer wrote to RingCentral, "I did a quick google and found

5  grim reviews to say the least," citing voipreview.org, which contained a number of reviews

6  posted by Labunski.  Mohammed Dec. Ex. C; Mullins Dec. Ex. 35; Yearwood Dec. ¶ 18.  At

7  times, potential customers were swayed by reviews contrasting aspects of Nextiva and

8  RingCentral that Labunski highlighted, e.g., "We were going to go toward RingCentral, but

9  recently discovered their **support** reviews are horrible," Mullins Dec. Ex. 52.

10         RingCentral lost identifiable prospects, including the following companies who paid to

11  Nextiva the recurring monthly revenue identified in the spreadsheets cited below:

| Company | Document Showing Loss | Recurring Mo. Revenue | Spreadsheet Showing Revenue |
|---|---|---|---|
| ████ | Mohammed Dec. Ex. B | ████ | Mullins Dec. Ex. 53 |
| | Mohammed Dec. Ex. D | | Mullins Dec. Ex. 53 |
| | Mohammed Dec. Ex. E | | Mullins Dec. Ex. 53 |
| | Mohammed Dec. Ex. G | | Mullins Dec. Ex. 53 |
| | Mohammed Dec. Ex. F | | Mullins Dec. Ex. 54 |

18  RingCentral identified eleven more customers with total forecasted annual revenues of $116,402

19  who went to Nextiva on the basis of negative online reviews.  *See* Chou Dec. Ex. A.

20         RingCentral's expert estimated total lost revenues because of Nextiva's actions at $52

21  million.  *See id.* Ex. 43 (Eichmann Depo.) at 151:16-19, 44 at 44.  In a billion-dollar industry

22  where RingCentral was subject to a years-long dirty tricks campaign (the contours of which are

23  still not entirely clear), that figure probably undercounts RingCentral's true injury.  The law does

24  not require scientific certainty in a damages calculation.  The evidence shows that customers read

25  reviews, were affected by them, and were diverted to Nextiva as a result.

26

27

28

1

**ARGUMENT**

2   **I.   NEXTIVA IS NOT ENTITLED TO SUMMARY JUDGMENT ON**
     **RINGCENTRAL'S DEFAMATION AND TRADE LIBEL CLAIMS.**

3

4        **A.    Nextiva's Juicing Of Its Product Ratings Supports Claims For Defamation**
              **And Trade Libel.**

5        Nextiva's fake negative reviews of RingCentral are defamatory, and it doesn't argue

6   otherwise.  Instead, Nextiva confines its argument to the proposition that its hundreds or even

7   thousands of fake positive reviews of its own services cannot support a defamation claim.  Mot. at

8   5-7.  Yet Nextiva juiced its reviews so much in 2018 that its ratings jumped more than a full

9   point, falsely moving ahead of RingCentral.  Mullins Dec. Ex. 43 (Eichmann Depo.) at 68:11-

10  72:2, Ex. 44 at 30, Schedule 7.  Nextiva's efforts to juice its ratings were specifically aimed at

11  RingCentral, and were accompanied by its fake negative reviews of RingCentral.  These efforts

12  were all of a piece.  ███████████████████████████████████████████

13  ██████████████████████████████████████████████████████████████

14  ██████   This is sufficient to support an express defamation claim.

15       Additionally, Nextiva created the fake positive ratings for itself and fake negative ratings

16  for RingCentral knowing they would be used by consumers to compare the two companies.  As

17  Nextiva acknowledges, Nextiva's and RingCentral's prospective customers "make their buying

18  decisions primarily on research they conduct online."  ECF 67 ¶ 12.  Prospective customers

19  *compare* the reviews of the two companies before making a decision; indeed, it was Nextiva's

20  sales strategy to encourage customers to do so.  *See* Mohammed Dec. Ex. B ("[T]he overall

21  reviews online that I saw favored Nextiva."), E ("[B]ased on the reviews I could find comparing

22  both services, we felt more comfortable going with [Nextiva]."), F ("Looking online I found

23  support was a bit higher along with customer satisfaction [for Nextiva compared to

24  RingCentral].");  ███████████████████████████████████████████

25  ██████████████████████████████████████████████████████████████

26       Under California law, a defamatory statement can be "expressly stated or implied."

27  *Forsher v. Bugliosi*, 26 Cal.3d 792, 803 (1980).  Thus, "[i]n determining whether a statement is

28  libelous [courts] look to what is explicitly stated as well as what insinuation and implication can

- 13 -

1   be reasonably drawn from the communication." *Id.* If a particular statement could be understood

2   either in an innocent sense or as having a defamatory implication, it is the jury's role to determine

3   in which manner the statement must ultimately be understood. *See Weller v. Am. Broad. Cos.,*

4   *Inc.*, 232 Cal.App.3d 991, 1003 (1991). Here, Nextiva made false positive statements about its

5   own consumer rankings along with the false negative statements about RingCentral knowing that

6   it would denigrate RingCentral in a market where consumers are expected to compare the two. A

7   reasonable jury could find not only express defamation, but also implied defamation because

8   Nextiva's fake positive reviews were expressly intended to impugn RingCentral's reputation and

9   were understood that way by prospective customers.

10       RingCentral can also rely on the fake positive reviews to show harm and that "[Nextiva's]

11   conduct was a substantial factor in causing [RingCentral's] harm." *See* Judicial Council of

12   California Civil Jury Instructions (2020) ("CACI") Nos. 1731 (trade libel), 1703 (defamation).

13   Nextiva's overall fake review scheme—including the positive reviews it posted of itself—caused

14   harm to RingCentral by worsening its reputation relative to Nextiva. A business' reputation is

15   highly contextual. Because a prospective customer's buying decision is inherently a comparative

16   process, the jury must consider evidence of Nextiva's posting of fake positive reviews alongside

17   evidence of the fake negative reviews in evaluating RingCentral's harm and damages for its

18   defamation and trade libel claims. Nextiva's campaign of falsehoods, and its belief that positive

19   and negative reviews would "kill" RingCentral, evidence its actual malice when it pursued its

20   scheme and are relevant to the calculation of punitive damages. *See* Cal. Civ. Code § 48a;

21   *Vachani v. Yakovlev*, 2016 WL 7406434, at *9 (N.D. Cal. Dec. 22, 2016) (Beeler, J.).

   **B.    A Reasonable Jury Could Conclude That RingCentral Can Establish The**
22       **Requisite Losses.**

23

24       Nextiva also contends that RingCentral's trade libel claim fails because RingCentral

25   cannot establish that Nextiva's statements caused RingCentral's harm. Mot. at 7-10. Its

26   argument is wrong on both the facts and the law.

27       First, RingCentral has evidence of specific accounts that were lost due to Nextiva's fake

28   negative reviews of RingCentral and can prove that Nextiva's actions were a substantial factor in

RINGCENTRAL'S OPP TO NEXTIVA'S MOTION
FOR SUMMARY JUDGMENT
5:19-cv-02626-NMC

1   causing those losses.  "Causation is generally a question of fact for the jury, unless reasonable

2   minds could not dispute the absence of causation."  *Lombardo v. Huysentruyt*, 91 Cal.App.4th

3   656, 666 (2001).  RingCentral need only show that Nextiva's libelous statements were a

4   "substantial factor" in causing its harm.  "A substantial factor in causing harm is a factor that a

5   reasonable person would consider to have contributed to the harm."  CACI No. 430; *see Mitchell*

6   *v. Gonzales*, 54 Cal.3d 1041, 1052 (1991) (substantial factor instruction should be given to juries

7   in tort cases and "subsumes the 'but for' test").  Nextiva's need not be the *only* factor causing

8   RingCentral harm.  "[A] defendant cannot avoid responsibility just because some other person,

9   condition, or event was also a substantial factor in causing the plaintiff's harm."  *Yanez v.*

10  *Plummer*, 221 Cal.App.4th 180, 187 (2013).

11        Here there is ample evidence from which a reasonable jury could conclude that Nextiva's

12  fake review scheme was a substantial factor in causing RingCentral harm.  Nextiva posted at least

13  85 fake negative reviews of RingCentral on at least seven different sites.  Yearwood Dec. ¶¶ 7-17.

14  The evidence further indicates that: **(1)** Nextiva's fake reviews harmed consumer perceptions of

15  RingCentral and increased the aggregate rating of Nextiva and decreased the aggregate rating of

16  RingCentral across several review sites with known fake reviews, Mullins Dec. Ex. 45 (Iyengar

17  Depo.) at 66:11-67:23, 46 at 3, 24, 27 (findings); **(2)** ████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████████

19  ██ ; and **(3)** several current and prospective RingCentral customers cited negative perceptions of

20  RingCentral, formed after reading online reviews, as the basis for their decision to not do business

21  with RingCentral.  Chou Dec. Ex. A.  In light of that evidence, a reasonable jury could conclude

22  that Nextiva's libelous, negative reviews of RingCentral were a substantial factor in causing

23  RingCentral's harm.

24        Second, tying a specific lost customer to Nextiva's libelous statements is unnecessary

25  because the statements were widely disseminated.  "California … has adopted the Restatement

26  formulation of trade libel law."  *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12

27  F.Supp.2d 1068, 1082 (C.D. Cal. 1998); *Leonardini v. Shell Oil Co.*, 216 Cal.App.3d 547, 572

28  (1989) ("California has adopted the Restatement formulation.").  The Restatement provides that,

1    in cases involving widely disseminated injurious falsehoods that "affect[] the conduct of a

2    number of persons whom the plaintiff is impossible to identify," plaintiffs can demonstrate

3    damages by showing lost sales following publication of the statements and eliminating all other

4    "reasonably likely causes."  Restatement (Second) of Torts § 633 (1977).  "Whether particular

5    evidence of this kind is sufficient to sustain the plaintiff's burden of proof as to his loss is a

6    question of fact …." *Id.*

7          Here, one of RingCentral's experts, Dr. Iyengar, found that the fake reviews posted by

8    Nextiva were associated with an increased consumer preference for Nextiva and a decreased

9    consumer preference for RingCentral.  *See* Mullins Dec. Ex. 46 at 3, 24, 27.  Based in part on Dr.

10   Iyengar's analysis, RingCentral has calculated that it lost tens of millions of dollars due to

11   Nextiva's actions.  *Id.* Ex. 43 (Eichmann Depo.) at 151:16-19, 44 at 10.  Under the Restatement's

12   formulation of trade libel, a reasonable jury could conclude that this evidence was sufficient to

13   demonstrate RingCentral's losses attributable to Nextiva's libelous statements.

14         The California Supreme Court has not rejected the general losses standard.  Intermediate

15   appellate courts have taken conflicting views.  *Compare Mann v. Quality Old Time Serv., Inc.*,

16   120 Cal.App.4th 90, 109 (2004), *disapproved of on other grounds by Baral v. Schnitt*, 1 Cal. 5th

17   376 (2016), *with Wright v. Coules*, 4 Cal.App. 343, 346-47 (1906).  *Wright* is on point:

18              [D]amages to a hotel business may be proven by showing the
                existence of facts which would naturally tend to diminish and tear
19              down that business followed by evidence showing that it was
                actually diminished and impaired thereby, and that this may be
20              shown without showing the specific name or giving the personal
                description of each guest who was driven away from the place or
21              prevented from coming there by reasons of the acts complained of.
                A general allegation such as indicated above of people being
22              dissuaded by reason of a publication from making any contract with
                or coming to the hotel or giving it their patronage, is sufficient.
23

24   Other state high courts have specifically relied on this approach to allow a claim when there is a

25   decline in business after an unfavorable and false ranking.  *Ellsworth v. Martindale-Hubbell Law

26   Dir.*, 68 N.D. 425 (1938) (citing *Wright*).

27         Under these circumstances, this Court's obligation is to do its best to predict the outcome

28   in the California Supreme Court.  *Pacheco v. United States*, 220 F.3d 1126, 1131 (9th Cir. 2000).

1    Nextiva has offered no reason to think it would repudiate the Restatement rule, which is well

2    accepted.  *See, e.g.*, *HipSaver, Inc. v. Kiel*, 464 Mass. 517, 539 (2013); *Rite Aid Corp. v. Lake*

3    *Shore Invs.*, 298 Md. 611, 625-26 (1984); *Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F.

4    Supp.150, 156 (S.D.N.Y. 1983).  To the contrary, requiring proof of a specific lost sale for trade

5    libel claims is inconsistent with the approach taken elsewhere by California courts.  The

6    Restatement addresses both trade libel and slander of title claims as "injurious falsehoods."  *See*

7    Restatement (Second) of Torts § 633 (1977).  California has adopted the Restatement formulation

8    of both torts.  *See Leonardini*, 216 Cal.App.3d at 572 (trade libel); *Sumner Hill Homeowners'*

9    *Assn., Inc. v. Rio Mesa Holdings, LLC*, 205 Cal.App.4th 999, 1030 (2012) (slander of title).  In

10   slander of title cases, California courts have not required proof of a *specific* lost sale to satisfy the

11   pecuniary harm element of the tort.  *See id.* at 1031 ("We do not agree that a plaintiff must always

12   show specific harm to vendibility, such as through proof of a lost sale or diminished value.");

13   *Appel v. Burman*, 159 Cal.App.3d 1209, 1215 (1984) ("Although the extant cases deal mainly

14   with the loss incurred as the result of losing a purchaser, it is clear in California that a slander of

15   title can result where no purchaser is present.").  This Court should adopt the same test here.

16   **II.    SUMMARY JUDGMENT IS NOT WARRANTED ON RINGCENTRAL'S**
         **INTENTIONAL INTERFERENCE CLAIM.**
17

18        **A.    A Reasonable Jury Could Conclude That RingCentral Has Established Lost**
              **Sales Associated With Specific, Named Customers.**

19        Nextiva next argues that summary judgment is warranted on RingCentral's intentional

20   interference with prospective economic advantage claim "because RingCentral cannot establish

21   special damages, *i.e.*, 'specifically itemized pecuniary harm that was proximately caused by'

22   Nextiva."  Mot. at 11-12.  RingCentral has evidence of *specific* customers and prospective

23   customers that terminated their relationship with RingCentral due to a relatively negative

24   perception of RingCentral or relatively positive perception of a competitor that they developed

25   based on reading online reviews.  *See* Chou Dec. Ex. A.  And there is a direct connection between

26   those customers and actions taken by Nextiva—Nextiva posted negative reviews of RingCentral

27   and positive reviews of itself that improved its reputation in the marketplace and damaged

28   RingCentral's.  *Id.* Ex. 44 at Schedule 7.

1    Citing no case law, Nextiva appears to assert that RingCentral must prove that a specific

2    customer read a specific review posted by Nextiva to demonstrate the requisite causation.  Mot. at

3    12.  But proof of that level of causation is not required.  Instead, RingCentral must prove that

4    Nextiva's conduct was a substantial factor in causing RingCentral's harm.  CACI No. 2202.

5    Whether particular evidence establishes the required causation is generally a question of fact for

6    the jury.  *See Lombardo*, 91 Cal.App.4th at 666.   As discussed above, RingCentral has evidence

7    that **(1)** Nextiva posted thousands of fake reviews; **(2)** Nextiva's fake reviews improved its

8    position in the marketplace and harmed RingCentral's; **(3)** specific customers terminated their

9    consideration of RingCentral based on their perceptions of RingCentral after reading online

10   reviews.  And Nextiva has admitted how important reviews are in this industry.  *See* ECF 67 ¶ 12.

11   A reasonable jury could thus conclude that Nextiva's fake review scheme was a substantial factor

12   in causing RingCentral to lose customers.

13   **B.   A Reasonable Jury Could Conclude That Nextiva Knew It Was Interfering
         With RingCentral's Prospective Contractual Relationships.**

14

15   Nextiva also contends that summary judgment is warranted on RingCentral's IIPEA claim

16   because Nextiva cannot prove that RingCentral "knew of the economic relationships with which

17   it allegedly interfered."  Mot. at 12.  But knowledge of a specific party's identity is not a

18   prerequisite to recovery for interference with prospective economic advantages.  *Altera Corp. v.*

19   *Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir. 2005) ("When the defendant performs the act

20   that causes the interference, the defendant need not know exactly who is a party to the contract, so

21   long as he knows he is interfering with a contractual relationship."); *Ramona Manor*

22   *Convalescent Hosp. v. Care Enters.*, 177 Cal.App.3d 1120, 1133 (1986) (same).  Nextiva knew

23   of, and focused its efforts on interfering with, RingCentral's relationships with its prospective

24   customers.  ███████████████████████████████████

25   ████████████████████████████████████████████████

26   ████████████████████████████████████

27   ████████████████████████████████████████████.  That

28   is sufficient to establish the requisite knowledge.  *Monex Deposit Co. v. Gilliam*, 680 F.Supp.2d

1148, 1163 (C.D. Cal. 2010) ("[Defendants] knew [plaintiff] had economic relationships with its customers, even if they did not have specific knowledge of [plaintiff's] relationship with [a particular customer]"); *Transcription Commc'ns Corp. v. John Muir Health*, 2009 WL 666943, at *10 (N.D. Cal. Mar. 13, 2009) (Henderson, J.) (same).

### III.   INJUNCTIVE RELIEF IS WARRANTED ON RINGCENTRAL'S UCL CLAIM.[4]

Nextiva has not moved for summary judgment on RingCentral's common law unfair competition claim (*see* ECF 116 (TAC) ¶ 95-99) and RingCentral thus does not address it further. *See* Mot. at 13-16.  Nextiva asserts that RingCentral is not entitled to injunctive relief on its UCL claim because Nextiva belatedly discontinued its violations after three years.  Mot. at 15-16. There are numerous reasons why the Court should disregard this assertion and require a trial.

*First*, whether the scheme has been permanently discontinued or this is merely a brief hiatus for Chief Marketing Officer Masjedi, the brother-in-law of Nextiva's CEO, is a question of credibility.  These men are deeply entwined by a web of family and financial relationships.  The conduct was going on for more than three years.  Nextiva did everything it could to hide this scheme throughout the litigation.  *See* ECF 162 (describing Nextiva's post-fact-discovery document dumps and belated admissions).  Even after firing Masjedi, Nextiva has taken action to prevent RingCentral from learning the full scope of its misconduct by attempting to delay or prevent Labunski's deposition.  *See* ECF 169.  Even if there were no evidence of involvement by others, the Court should require Nextiva to show up in Court and explain its actions in person. *See Shenwick v. Twitter, Inc.*, 2021 WL 1232451, at *14 (N.D. Cal. Mar. 31, 2021) (Tigar, J.) (noting the "obvious advantages of live testimony" including that it enables the trier of fact to "better assess demeanor and credibility") (citation omitted).  The Court thus should deny this part of Nextiva's motion based on the need for in-person assessment of its witnesses alone.

*Second*, there is a mountain of evidence that this scheme pervaded the company from top to bottom.  Nextiva's belated firings do not even come close to addressing the scope of the problem at Nextiva.  Contrary to Nextiva's claim, it has not fired *all* of the people that had

---

[4] RingCentral's damages expert only offered calculations of actual harm and cybersquatting statutory damages.  Thus, RingCentral does not seek restitution under the UCL.

1  knowledge of or participated in the scheme. ███████████████████████

2  █████████████████████████████████████████████████

3  █████████████████████████████████████████████████

4  █████████████████████████████████████████████████

5  █████████████████████████████████████████████████

6  ███████████████████████████████████████████████████

7  ████

8       ***Third***, even if this Court were to take Nextiva's word that its unfair and unlawful acts

9  have been discontinued, they are reasonably likely to recur and thus an injunction is still

10  necessary.  *See California Serv. Station etc. Assn. v. Union Oil Co.*, 232 Cal.App.3d 44, 57 (1991)

11  (holding that it was within trial court's discretion to issue an injunction even though the defendant

12  said it "did not intend to violate [the law] and that it w[ould] pursue a lawful policy in the

13  future"). ██████████████████████████████████

14  ███████████  This was not merely a sales and marketing team failure but a companywide

15  failure. ████████████████████████████████████████

16  █████████████████████████████████████████████

17  ██████████████████████████████████████████████████

18  ████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████████

21  ██████████████████████████████████████████

22  ███████████████████████████████████████████████

23  ████████████████████████████████████

24  ██████████████████████████████  There is no basis to believe

25  the limited policies that Nextiva put in place will be effective to prevent this kind of

26  companywide misconduct going forward—especially considering that leaders who turned a blind

27  eye or knew of the misconduct and allowed it to continue remain with the company.

28       At the very least, whatever deterrent policies Nextiva has put in place must be granted the

1    force of law via an injunction.  In light of the pervasive nature of the scheme and the necessity to

2    assess credibility, this Court should deny summary judgment on RingCentral's UCL claim.

3    **IV.    RINGCENTRAL HAS STANDING TO PURSUE ITS CYBERSQUATTING**
         **CLAIM AND NEXTIVA IS LIABLE FOR LABUNSKI'S ROLE IN IT.**
4
         **A.    RingCentral Has Suffered Actionable Harm Due To Nextiva's**
5             **Cybersquatting.**

6         Nextiva contends that RingCentral does not have standing to pursue its cybersquatting

7    claim because it has no evidence that it has suffered "concrete" harm.  Mot. at 16-18.  Nextiva

8    misunderstands the relevant law and the facts.

9         A violation of ACPA alone establishes concrete harm.  Nextiva's cursory discussion of

10   standing appears to suggest that a violation of a statute is not sufficient, on its own, to constitute

11   concrete harm.  Not so.  "When … a statutory provision identifies a substantive right that is

12   infringed any time it is violated, a plaintiff bringing a claim under that provision '*need not allege*

13   *any further harm to have standing*.'"  *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117 (9th Cir.

14   2020) (citation omitted and emphasis added).  ACPA creates a substantive right for mark owners

15   to be free from cybersquatting carried out by those that have a bad faith intent to profit from their

16   marks.  *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 230 (4th Cir. 2002)

17   (discussing "substantive rights" provided by ACPA); *cf. Pac. Supply Co-op. v. Farmers Union*

18   *Cent. Exch. Inc.*, 318 F.2d 894, 905-06 (9th Cir. 1963) (finding that the Lanham Act creates

19   substantive rights); *Anheuser-Busch, Inc. v. Bavarian Brewing Co.*, 264 F.2d 88, 90, 84 (6th Cir.

20   1959) (same).  Concluding that ACPA creates a substantive right is consistent with the text of the

21   statute.  ACPA provides that a person "shall be liable" to a mark owner if they merely *register* a

22   domain name that is confusingly similar to the owner's mark with the requisite intent.  15 U.S.C.

23   § 1125(d)(1)(A).  That the ACPA provides for statutory damages also indicates that Congress

24   recognized that cybersquatting causes harm which may be difficult to demonstrate and quantify.

25   *Cf. Amy v. Curtis*, 2020 WL 5365979, at *6 (N.D. Cal. Sept. 8, 2020) (Hamilton, J.).  Nextiva's

26   bad faith registration alone, without any further use, creates liability under the statute.

27        Additionally, the fake emails sent by Labunski harmed RingCentral's reputation and

28   brand with the Better Business Bureau, Fit Small Business, and any other review websites who

1   received emails from the ringcetrnal.com domain.  Labunski has yet to weigh in other this topic.

2   These sites are not only important to RingCentral because they host reviews that have a material

3   impact on RingCentral's business, as discussed herein, but because they are also potential

4   RingCentral customers.  Their opinions of RingCentral or its products and services may have

5   been harmed by Labunski's actions.  This kind of reputational harm is difficult to quantify, but

6   "the law has long permitted recovery by certain tort victims even if their harms may be difficult to

7   prove or measure."  *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1549 (2016) (citing slander of title as

8   a cause of action where victims have standing to pursue their claims even though their harms may

9   be difficult to prove or measure).

10       In arguing that RingCentral suffered no harm, Nextiva relies heavily on the deposition of

11   Tiffany Wan, but her testimony (which Nextiva in any event overstates) does not change the fact

12   that proof of a violation of ACPA alone is sufficient to confer standing.  Because RingCentral has

13   established that it suffered "concrete" harm, it has standing to pursue its cybersquatting claim.

14       **B.      Labunski's Actions Are Attributable To Nextiva.**

15       Nextiva also argues that it is not liable for Labunski's registration of ringcetrnal.com

16   because he was not, as a matter of law, acting as Nextiva's agent.  Mot. at 18-20.  This is a

17   frivolous argument.  If anything, summary judgment should be granted for RingCentral that

18   Labunski *was* acting as Nextiva's agent as a matter of law.  At a minimum, the question should be

19   tried.  *Seneris v. Haas*, 45 Cal.2d 811, 831 (1955) ("Unless the evidence is susceptible of but a

20   single inference, the question of agency is one of fact for the jury.").

21       **1.      Labunski had actual authority as Nextiva's agent to register and use**
22              **ringcetrnal.com.**

23       "It is well established that traditional vicarious liability rules ordinarily make principals or

24   employers vicariously liable for acts of their agents or employees in the scope of their authority or

25   employment."  *Meyer v. Holley*, 537 U.S. 280, 285 (2003).  Federal common law of agency is

26   used in interpreting federal statutes.  *See Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456

27   U.S. 556, 566-67 (1982).  Federal courts apply the Restatement as an expression of federal

28   common law agency principles.  *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1251

1    (10th Cir. 2013) (applying the Restatement (Third) of Agency under Lanham Act); *In re*

2    *ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 478 (9th Cir. 2015) (federal common law of

3    agency permits imputation of scienter).  A principal is liable under the Lanham Act for all actions

4    of an agent acting within the scope of authority.  *Operation Tech., Inc. v. Cyme Int'l T&D, Inc.*,

5    2016 WL 6246806 (C.D. Cal. 2016) (denying defendant's motion for summary judgment).

6         An agency relationship arises "when one person (a 'principal') manifests assent to another

7    person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's

8    control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) Of

9    Agency § 1.01 (2006).  "An agent acts with actual authority when, at the time of taking action

10   that has legal consequences for the principal, the agent reasonably believes, in accordance with

11   the principal's manifestations to the agent, that the principal wishes the agent so to act."  *Id. at* §

12   2.01.  A principal is liable to a third party harmed by an agent's tortious conduct within the scope

13   of actual authority.  *Id.* at §7.04.

14   ███████████████████████████████████████████████

15   ██████████████████████████████████████████

16   ████████████████████████████████████   Together, they carried out the

17   fake review schemes by pretending to be someone else, repeatedly.  Labunski routinely registered

18   domain names as part of carrying out his schemes on behalf of Nextiva, and Nextiva routinely

19   paid for those domain names. Hill Dec. Ex. 1 at RC_Sub_003540-42 (showing domain purchases

20   in the "baruchl" Namecheap account paid for with a credit card bearing the name "Yaniv

21   Masjedi").  Masjedi specifically instructed Labunski to go after RingCentral—repeatedly.  *See id.*

22   Exs. 23-24.  Nextiva paid for the ringcentrnal.com domain name and had ongoing access to the

23   account in which it was registered.  It is objectively reasonable to believe that Labunski had

24   actual authority to obtain the ringcetrnal.com domain name and use it for impersonation purposes.

25        Citing an unpublished Ninth Circuit case under Washington law, Nextiva argues that

26   Labunski was not Nextiva's agent because its consulting agreement with him disclaimed an

27   agency relationship.  Mot. at 19.  Nextiva thus argues that—despite a mountain of evidence of

28   actual authority—this single recitation *in a contract* ██████████████████████  is

1   dispositive of the question of actual authority.  Nope.  "Whether a relationship is characterized as

2   agency in an agreement between parties … *is not controlling*."  *Restatement* at § 1.02.  An

3   independent contractor plainly can be an agent.  *1-800 Contacts*, 722 F.3d at 1251.  ████

4   ████████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████.

6        Nextiva next argues that "[t]here is no evidence that Labunski subjectively believed that

7   Nextiva had authorized him to register the ringcetrnal.com domain," and summary judgment

8   should be granted on that basis.  Mot. at 20.  This is silly.  All of the evidence that such a belief is

9   objectively reasonable is also circumstantial evidence that Labunski held such a belief.  *See, e.g.*,

10  *United States v. Nava*, 687 F.App'x 528, 529 (9th Cir. 2017) (affirming conviction because

11  circumstantial evidence was sufficient to support the jury's finding regarding the defendant's

12  subjective belief).  Perforce summary judgment should not be granted regarding a matter of

13  Labunski's purported belief when Labunski has not yet been examined regarding that belief.  Fed.

14  R. Civ. P. 56(d); *see* Hurst Decl.  ¶¶ 5, 12-13.

15       Even if Labunski were to give testimony disavowing a belief that he was authorized

16  (indeed, instructed) by Masjedi and Nextiva to carry out these acts, that testimony cannot be

17  credited for purposes of summary judgment.  To put it bluntly, we're dealing here with a pack of

18  known liars.  If the Court is going to credit Labunski's belief at all rather than simply granting

19  judgment for RingCentral of agency on the objective record, then the Court should have the jury

20  evaluate the question.  It certainly cannot properly grant judgment for Nextiva.

21                    **2.    Nextiva negligently supervised Labunski.**

22       As detailed above, the evidence establishes, at a minimum, that Labunski had actual

23  authority to register domains on behalf of Nextiva in reputation management schemes.  The law

24  does not require that Nextiva specifically pre-authorize Labunski to cybersquat on a particular

25  domain, and especially not where Masjedi specifically and repeatedly instructed Labunski to go

26  after RingCentral and derided him for failing to do so.  In all events, at worst, Masjedi's

27  negligence in supervising Labunski's activities also makes Nextiva liable for the cybersquatting.

28       "A principal who conducts an activity through an agent is subject to liability for harm to a

1   third party caused by the agent's conduct if the harm was caused by the principal's negligence in

2   … supervising[] or otherwise controlling the agent…." *Restatement* at § 7.05.  Here, Labunski

3   was clearly acting as Nextiva's agent for the purpose of registering domains.  Having authorized

4   Labunski to register domains on its behalf, Nextiva cannot escape liability for Masjedi's negligent

5   failure to supervise Labunski's domain name registration activities.

6       "A person's conduct is negligent 'if the person does not exercise reasonable care under all

7   the circumstances.'" *Restatement* § 7.05 (citation omitted).  The duty to exercise reasonable care

8   "encompasses the instructions [a principal] provides to its agents and others through whom it

9   conducts activities because proper instructions may be necessary to prevent an undue risk of harm

10  to third parties." *Id.*  Masjedi breached this duty from the start in instructing Labunski because he

11  was already directed Labunski to perform illegal acts—registering fake domains and posting false

12  or misleading reviews of Nextiva or its competitors online.

13      A reasonable jury could conclude that Labunski's registration of ringcetrnal.com and his

14  attempt to use it to harm RingCentral was foreseeable and that Masjedi's negligent supervision

15  and instructions were the cause.  RingCentral was a common topic of conversation among

16  Masjedi and Labunski and many of their plans were aimed at "kill[ing]" RingCentral.  *See*

17  Mullins Dec. Ex. 7.  When he instructed Labunski to register additional domains, Masjedi had

18  just complained of RingCentral's "prime" position on review sites, *id.* Ex. 10, and told Labunski

19  to do what was necessary to get Nextiva to a "better place," *id.* Ex. 41.  Masjedi's failure to give

20  Labunski lawful instructions or supervise his activities resulted in the registration of

21  ringcetrnal.com and Nextiva's breach of ACPA.

## **CONCLUSION**

23      For the foregoing reasons, Nextiva's motion for summary judgment should be denied.

1    Dated: April 14, 2021                    ORRICK, HERRINGTON & SUTCLIFFE
2                                             LLP

3
                                             By:   /s/ Annette L. Hurst
4                                                  Annette L. Hurst (SBN 148738)
                                                   ahurst@orrick.com
5                                                  The Orrick Building
                                                   405 Howard Street
6                                                  San Francisco, CA 94105-2669
                                                   Telephone: (415) 773-5700
7                                                  Fax: (415) 773-5759

8                                                  Attorneys for Plaintiff
                                                   RINGCENTRAL, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28